# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN 17 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| **PUBLIC CITIZEN, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 01-2351 (ESH) |
| **DEPARTMENT OF EDUCATION and** | ) | |
| **DEPARTMENT OF STATE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Public Citizen, Inc., a nonprofit consumer advocacy organization, brings this suit under the Freedom of Information Act, 5 U.S.C. § 552 (hereinafter the "FOIA"). In Count I, plaintiff claims that the Department of Education (hereinafter the "DOE") has improperly withheld the requested documents under the FOIA's Exemption 6, 5 U.S.C. § 552(b)(6). In Count II, plaintiff claims that DOE and the Department of State have violated the FOIA's notice requirement under 5 U.S.C. § 552(a)(6)(B)(i), which plaintiff interprets as requiring notice to FOIA requesters when an agency is unable to respond within the twenty-day time period provided by statute. While the Court is persuaded by plaintiff's argument that the requested documents are not protected from disclosure by Exemption 6, it does not agree with plaintiff's arguments on the merits as to Count II.[1]

---

[1] On June 6, 2002, the parties filed a stipulation of dismissal of Count I insofar as it sought records from the Department of State and of Count III.

1




I.    **COUNT I:   REQUEST FOR DEPARTMENT OF EDUCATION RECORDS**

**FACTUAL  BACKGROUND**

Plaintiff seeks disclosure of records under the FOIA in an effort to shed light on DOE's

activities and to be able to inform certain student loan borrowers of their potential eligibility for

loan discharges.  The history relevant to plaintiff's requests begins in 1992 when Congress

enacted a statute that required the Secretary of Education to discharge loans of "falsely certified"

borrowers.[2]  *See* 20 U.S.C. § 1087(c)(1).  Congress took such action "in response to public

concern about vocational schools that defrauded students by falsely certifying their ability to

benefit and then providing them worthless training."  *Jordan*, 194 F.3d at 170.  Thereafter, the

Secretary of Education implemented regulations that required any student seeking discharge to

submit a statement that he or she had "made a reasonable attempt to obtain employment in the

occupation for which the program was intended to provide training, and (1) [w]as not able to find

employment in that occupation; or (2) [o]btained employment in that occupation only after

receiving additional training that was not provided by the school that certified the loan."  *See* 34

C.F.R. § 682.402(e)(3)(ii)(C) (quoted in *Jordan*, 194 F.3d at 170)).

In 1999, the Court in *Jordan* held that these conditions were unlawful, finding that certain

borrowers were denied discharges because of illegal conditions not authorized by statute.  The

Court concluded: "[T]he Secretary has done more than simply add an obligation that is not in the

statute; he has changed the nature of the statute."  *Jordan*, 194 F.3d at 171.  In response, on

---

[2]For a fuller explanation of the relevant history, see this Circuit's decision in *Jordan v. Sec'y of Education*, 194 F.3d 169 (D.C. Cir. 1999).

October 24, 2000, the Secretary of Education removed the "employment attempt" provisions in

34 C.F.R. § 682.402(e)(3)(ii)(C), but in the process did not grant the discharge applications that

had previously been denied between 1992 and 2000  *See* Federal Family Education Loan (FFEL)

Program and William D. Ford Federal Direct Loan Program, 65 Fed. Reg. 65616, 65620 (Nov. 1,

2000) (to be codified at 34 C.F.R. § 682.402).

Plaintiff made two FOIA requests to DOE for information relating to the student loan

borrowers who had been improperly denied discharges between 1992 and 2000.  On June 28,

2001, plaintiff requested release of records describing (i) "the actions that the Department has

taken to make    . information [concerning the discharge of student loans for false certification]

available" and (ii) "any other actions that the Department has taken to discharge the loans of

students who were falsely certified but were denied discharge because of the employment attempt

provisions in the discharge regulations." (Pl.'s Ex. B.)  On August 13, 2001, plaintiff requested

"records that identify the borrowers who were denied discharge under 20 U.S.C. [§] 1087(c)(1)

on the basis of the subsequent employment conditions that the Department initially imposed."

(Pl.'s Ex. C.)  Thereafter, on November 13, 2001, plaintiff filed its complaint seeking to compel

disclosure of the requested records.

By letter dated January 7, 2002 (*see* Defs.' Attachment 3), the FOIA Officer at DOE

responded to these requests.  DOE provided a "Dear Colleague Letter," dated July 2000, in

response to plaintiff's request for documents reflecting DOE's actions to make information

available relating to the discharge of student loans for false certification. (*See* Defs.' Attachment

1.)  The "Dear Colleague" letter advised Guaranty Agencies and DOE personnel of the *Jordan*

decision and the resulting changes in DOE policy. (*See id.; see also* Declaration of Ronald F.

3

Robinson at ¶¶ 7-9.)   In response to the second part of the June request, seeking information

relating to other actions taken to discharge loans of "falsely certified" borrowers, DOE stated:

> The Department's decisions to deny the discharge of student loans to those
> who were falsely certified, made prior to the [*Jordan*] decision, were in
> accordance with the Department's policy at the time.  Hence, the
> Department has not reconsidered those student discharges to see if they
> now qualify for a discharge, nor does the current regulation mandate such
> reconsideration.  There are, therefore, no documents available presently to
> satisfy this request.

(Defs.' Attachment 3; *see also* Declaration of Ronald F. Robinson at ¶ 9.)

With respect to plaintiff's August request for records identifying borrowers who were

denied discharges based on the DOE requirement regarding subsequent employment conditions,

the DOE claims that the records are exempt from disclosure under Exemption 6, which allows

the withholding of "personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy." (Defs.' Attachment 3 )  It argues

that release would result in a "clearly unwarranted invasion of personal privacy" and that this

interest is not outweighed by the public's interest.  (*Id.*)  In support of its claim, DOE has

submitted the declaration of Ronald F. Robinson, the Branch Chief for the Contract Service

Branch in the Department of Education, Region IX, Office of Student Financial Assistance, in

which he explains that release of the requested information would reveal private information

about certain individuals, including their social security numbers and the fact that while they had

obtained an education, these borrowers "either did not apply for employment in the field of study

for which they obtained an education, or applied for employment, but remained unsuccessful in

obtaining employment." (Declaration of Ronald F. Robinson at ¶¶ 4-17.)

4

**LEGAL ANALYSIS**

What remains at issue is whether Exemption 6 prevents the release of the information

sought in plaintiff's August 13, 2001 FOIA request.  "Exemption 6 [i]s directed at threats to

privacy interests more palpable than mere possibilities."  *Dep't of the Air Force v. Rose*, 425 U.S.

352, 381 n.19 (1976).  In satisfying its burden, the government cannot rely on "conclusory and

generalized allegations."  *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).  In the instant

case, DOE has failed to meet its burden, for there is insufficient evidence to sustain a claim of

Exemption 6.  *See id.* at 826-28.  Therefore, the requested information must be released.

Both parties agree that the Court is bound by the framework set forth by this Circuit in

*Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999).  In assessing whether the requested

information should be released under Exemption 6, the Court must weigh the "'privacy interest

in non-disclosure against the public interest in the release of the records in order to determine

whether, on balance, the disclosure would work a clearly unwarranted invasion of personal

privacy.'"  *Id.* at 46 (quoting *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873,

874 (D.C. Cir. 1989) (hereinafter "*NARFE*")).  But this analysis must also "include consideration

of any interest the individual might have in the release of the information, particularly when the

individuals who are 'protected' under this exemption are likely unaware of the information that

could benefit them."  *Lepelletier*, 164 F.3d at 48.

In *Lepelletier*, plaintiff was an independent money finder who sought release under the

FOIA of names of depositors with unclaimed funds at three banks for which the Federal Deposit

Insurance Corporation (hereinafter "FDIC") was the receiver.  *Id.* at 39.  During its seven years as

receiver, the FDIC had sent only one notice to the last known addresses of depositors informing

5

them that their unclaimed funds would be forfeited if they remained unclaimed. *See id.* While the FDIC released lists of the amounts of unclaimed deposits and of governmental entities and deceased individuals with unclaimed deposits, it refused to provide a list of corporations and living individuals with unclaimed deposits. *See id.*

The Court of Appeals concluded that while there was no particular public interest in release of the names and addresses, disclosure was to be ordered if the depositors' interest in learning of their money outweighed their privacy interest. *Id.* at 49. In expanding the applicable analysis, the Court denied the FDIC's attempt to protect financial information under Exemption 6, concluding that the individuals' direct benefit from the release of information outweighed their privacy interest, because disclosure would substantially increase the probability that bank depositors would be "reunited with their funds." *See id.* at 46-48. In so holding, this Circuit noted: "[I]t is overly paternalistic to insist upon protecting an individual's privacy interest when there is good reason to believe that he or she would rather have both the publicity and the money than have neither." *Id.* at 48

Here, plaintiff has presented an even more compelling argument in favor of disclosure than Lepelletier did. First, there are substantial benefits that student loan borrowers would directly gain by virtue of disclosure – a point which defendants do not even attempt to contest. As in *Lepelletier*, the very individuals whose privacy interests are implicated by the FOIA request have "a clear interest in the disclosure of their names and addresses," because they have a "clear prospect of securing a direct benefit by virtue of disclosure." *Id.* at 47. The borrowers would directly benefit from disclosure of information revealing that they were negatively impacted by unlawful DOE regulations, because any borrower who ultimately is able to receive a

discharge could have the money refunded or have debts owed to the government cancelled. *See*

34 C.F.R. § 682.402(e)(2)(i)-(ii).  Importantly, discharge could also result in a borrower having

his or her eligibility for federal educational assistance restored and any adverse credit history

could be expunged from credit reports. *See id.* at § 682.402(e)(2).

Furthermore, many borrowers are likely unaware that they were improperly denied

discharges – a factor that this Circuit found meaningful in *Lepelletier*  *See* 164 F.3d at 48.  As is

clear from defendants' papers, DOE has heretofore made no efforts to identify or contact the

affected group of borrowers, even though it has the capability of doing so based on information

in its possession. (*See* Declaration of Ronald F. Robinson at ¶¶ 12-16.)

In attempting to distinguish *Lepelletier*, defendants rely almost exclusively on their

argument that the invasion of the borrowers' privacy is severe, whereas "the only information to

be released [in *Lepelletier*] was that [a] list of individuals had available to them unclaimed

funds." (Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Cross-

Motion for Partial Summary Judgment and Reply in Support of Defendants' Motion to Dismiss

and for Partial Summary Judgment at 3 [hereinafter "Defs.' Opp."].)  According to defendants,

disclosure here would reveal "highly personal" and "embarrassing" information about

individuals' "scholastic achievement" by identifying them as student loan borrowers who were

falsely certified by a lending institution. (*Id.* at 3-5.)  Defendants claim that this is significant,

because being identified as "falsely certified borrowers" would reveal "[that persons] did not

graduate from high school as of the date they received the loan[s], that they had no GED[s], but

still were certified to have certain skills which they did not, and that they either did not qualify

for employment after leaving school or were so unmotivated that they even failed to look

7

sufficiently for [] job[s]." (*Id.* at 5.) Lastly, defendants argue that "a credit reporting organization might well be interested in the same information in an effort to identify whether a borrower might be likely to utilize the lawful Bankruptcy Laws to escape a future debt." (*Id.* at 4.)

Defendants' arguments are unconvincing. Defendants have overstated the extent of any invasion of privacy given the lack of stigma associated with this particular information. *See War Babes v. Wilson*, 770 F. Supp. 1, 3 (D.D.C. 1990) ("[T]he disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.") (citing *NARFE*, 879 F 2d at 874). In this case, "[t]he records merely indicate that [certain] borrowers did not have a high school degree or equivalency at some unspecified time after January 1, 1986." (Reply in Support of Plaintiff's Cross-Motion for Partial Summary Judgment at 2 [hereinafter "Pl.'s Rep"].) This information says nothing about their current level of education, nor does it reveal whether the individuals possess certain skill levels, because the false certification regulations applied in circumstances when schools had improperly certified individuals without administering tests, as well as when schools had certified individuals unable to pass tests. *See* Federal Family Education Loan Program, 59 Fed. Reg. 2486, 2489 (January 14, 1994). Similarly, defendants' speculative argument regarding a credit reporting agency's hypothetical interest in this information is also unpersuasive, for, even if an individual applied for a discharge, this does not mean that he or she will be more likely to file for bankruptcy. In fact, defendants' claim that release of borrowers' names and addresses will result in a clearly unwarranted intrusion is, "at the moment, sheer

speculation." *War Babes*, 770 F. Supp. at 4.[2/]

Lastly, the Court considers whether the public interest favors disclosure, though under *Lepelletier* the presence of such an interest is not essential given the clear interest of the borrowers. *Id.* at 48   While the government addresses this point only in passing (*see* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss and for Summary Judgment at 13-14 [hereinafter "Defs.' Mem.")]; Defs.' Opp. at 4), the relevant case law indicates that this factor tips slightly in favor of plaintiff.  In determining the nature of the public interest in disclosure, the Court looks to "'the nature of the requested document and its relationship to the basic purpose of [the FOIA] to open agency action to the light of public scrutiny '" *Painting & Drywall Work Preservation Fund, Inc. v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991) (quoting *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772 (1989)).  "The only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information would 'shed light on [the] agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 46 (quoting *United States Dep't of Defense v. FLRA*, 510 U.S. 487, 497 (1994)).  *See also NARFE*, 879 F.2d at 874 (disclosure is warranted where the public "would

---

[2/] In *War Babes v. Wilson*, 300 British citizens sought information, including the current addresses, of former American servicemen whom they believed were their natural fathers.  The government refused to disclose the requested information under Exemption 6.  770 F. Supp. at 4. The Court held that the government had not sustained its burden of proof that disclosure of the whereabouts of identified servicemen would constitute a clearly unwarranted invasion of privacy. Under the "unique circumstances" of *War Babes*, the Court found that the government could only sustain its burden by individually contacting each affected serviceman to determine whether disclosure would be offensive to him.  *Id.* at 5.  Here, the government need not make such an inquiry, given the clear and direct interest of the borrowers, as well as the public's interest in disclosure.

learn something about the workings of the Government").

In its August 13, 2001 letter, plaintiff requested "records that identify the borrowers whose loans were not discharged on the basis that the borrower did not show that he or she was not employed in the occupation for which the program was intended to provide training, or because the borrower did not show that he or she made a reasonable attempt to obtain employment in the occupation for which the program was intended to provide training." (Pl 's Ex. C.) By obtaining this information, the aggregate number of borrowers could be determined, and thus, as argued by plaintiff, disclosure would serve the public interest by revealing "the scope or magnitude of the harm to borrowers that has resulted from the Secretary of Education's failure to fully comply with 20 U.S.C. § 1087(c)'s mandate that he discharge the loans of borrowers who were falsely certified." (Pl.'s Rep. at 7.)

While there is no public interest in the actual names and addresses, *see Gannett Satellite Information, Inc. v. United States Dep't of Education*, 1990 WL 251480, at *6 (D.D C. 1990), there is a public interest in learning the aggregate number of borrowers, for DOE has yet to release information regarding the number of borrowers who were denied discharges based on the subsequent employment provisions and has indicated that it will not do so because of the time and expense involved. (*See* Declaration of Ronald F. Robinson at ¶¶ 9, 12; *see also* Defs.' Attachment 3, at ¶ 2.) Thus, release of the requested information will further the public interest by disclosing the extent to which the DOE is complying with its statutory duties regarding discharge of student loans.[4] *See Cooper Cameron Corp. v. United States Dep't of Labor*, 280

---

[4]The facts here are distinguishable from *Lepelletier* and *NARFE*, where the Circuit found no public interest. Release in *Lepelletier* would have only provided financial benefits to private individuals, specifically depositors and money finders; it would not have addressed a more global

F.3d 539, 548 (5th Cir. 2002) (recognizing "a cognizable public interest in monitoring agencies'

enforcement of the law in specific instances" and thus ordering release of records that show extent

to which OSHA complied with its regulations); *see also United States Dep't of State v. Ray*, 502

U.S. 164, 178 (1991) (finding public interest in release of witness interviews that would address

whether State Department was adequately monitoring Haiti's compliance with its obligation not to

persecute refugees and whether State Department was honest in its public assurances regarding

Haiti's compliance).

    In sum, having balanced the borrowers' clear interest in the disclosure of this information

and the public's interest in knowing the magnitude of the problem against the minimal privacy

interests of these same borrowers, the Court concludes that DOE must comply with plaintiff's

August 13, 2001 request.  Nonetheless, the Court is mindful of limiting the invasion of privacy for

affected individuals as much as possible.[5]  Thus, DOE must redact any personal information,

including social security numbers, that exceeds the scope of plaintiff's request.[6]  Limiting the

---

issue of what the government was "up to," such as the quantum of funds that the FDIC might
receive if unclaimed by depositors or any agency action regarding such funds. *See* 164 F.3d at
46.  Similarly, in *NARFE,* disclosure would only have benefitted the National Association of
Retired Federal Employees in its lobbying activities, and thus brought to light not "what the
Government is up to," but "only what it might be up to if NARFE had its druthers." 879 F.2d at
879  *See also Painting and Drywall Work Preservation Fund, Inc.*, 936 F.2d at 1303 (no public
interest found where nonprofit cooperative society sought names, addresses, and social security
numbers of government employees in order to investigate contractors' compliance with federal
laws, because disclosure did not reveal information about the agency's conduct).

    [5]In requiring such limitations, the Court is guided by the restrictions imposed on the
FDIC in *Lepelletier,* 164 F.3d at 48 (requiring FDIC not to release names "matched" with
amounts owed to those particular individuals).

    [6]Plaintiff does not dispute DOE's authority to redact sensitive information, such as
"'social security numbers and other personal identifiers of the borrowers.'" (Memorandum in
Support of Cross-Motion for Partial Summary Judgment and Opposition to Defendants' Motion

11

disclosure in this way will accomplish plaintiff's desired objectives, while at the same time

address some of DOE's concerns regarding the release of information contained in the borrowers'

files. (*See* Declaration of Ronald F. Robinson at ¶ 14.)

## II.   COUNT II:  NOTICE UNDER THE FOIA

Plaintiff moves in Count II for summary judgment against both defendants on the grounds

that defendants have violated the FOIA, because of their failure to provide the notice described in

5 U.S.C. § 552(a)(6)(B)(i) when they are unable to respond within the twenty-day time period

provided by statute.  In particular, plaintiff claims that under the FOIA, an agency must give a

requester written notice that sets forth both the "unusual circumstances" that justify the agency's

need for additional time and "the date on which [the agency's] determination is expected to be

dispatched."  5 U.S.C. § 552(a)(6)(B)(i).  Defendants dispute plaintiff's interpretation, arguing

that this section does not impose a mandatory notice requirement when an agency is unable to

meet statutory deadlines.  In addition to disagreeing with plaintiff on the merits, defendants also

raise a number of threshold arguments for dismissal.  While the Court finds no bar to a

consideration of the merits of plaintiff's claim, it is not persuaded that the statute imposes a

mandatory notice requirement.

---

to Dismiss and for Partial Summary Judgment at 14 [hereinafter "Pl.'s Mem."]) (quoting Defs.'
Mem. at 11.)

### A.   Plaintiff's Motion to Dismiss

Defendants have moved to dismiss Count II, arguing that plaintiff's claim is barred by sovereign immunity, by the structure of the FOIA itself, and by ripeness and exhaustion principles.  These arguments are unavailing.

First, defendants may not invoke sovereign immunity, for the Administrative Procedure Act, 5 U.S.C. § 702 (hereinafter "APA"), establishes the necessary waiver of jurisdiction for the non-monetary relief sought by plaintiff.  "The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citing, *inter alia, Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984); *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981)).

Second, defendants' argument that plaintiff's position is inconsistent with the structure of the FOIA appears to be premised on a misreading of plaintiff's claim.  While it is true that the FOIA provides timetables for responses and permits judicial review in the event that an agency fails to process adequately a FOIA request, the existence of these rights and remedies does not respond to plaintiff's facial challenge to defendants' practice of failing to provide notice, which, according to plaintiff, is statutorily required.  As recognized by the Court of Appeals in *Public Citizen v. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002), a plaintiff has the right to maintain a facial challenge to an agency's general practice on the grounds that it contravenes the statute.  Thus, whether plaintiff can challenge an agency's response or lack thereof in a particular circumstance does not determine whether it can challenge the agency's interpretation of its duties under the law.

Similarly, defendants' ripeness argument must fail.  The ripeness inquiry requires the

Court to evaluate "'the fitness of the issues for judicial resolution and the hardship to the parties of withholding court consideration.'" *Public Citizen*, 276 F 3d at 640 (quoting *Texas v. United States*, 523 U.S. 296, 300-01 (1998))   In determining ripeness, the Court must balance "'the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Payne Enterprises v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988) (quoting *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)). "A case is ripe 'when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues, . . . [and] there is no doubt whatever that the challenged agency practice has crystallized sufficiently for purposes of judicial review '" *Public Citizen*, 276 F.3d at 641 (D.C. Cir. 2002) (quoting *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999)).

Here, plaintiff has raised a purely legal issue as to which no additional facts are needed. DOE and the Department of State have applied the statutory provisions at issue so that the issue can fairly be said to have "crystallized." Defendants argue unequivocally that notice is not mandatory, and thus, there is no reason to defer adjudication. *See Public Citizen*, 276 F.3d at 642 ("'Where . . . the agency has stated that the action in question governs and will continue to govern its decisions, such action must be viewed as final in our analysis of ripeness.'") (citation omitted).

Finally, defendants' exhaustion argument is lacking in merit. Plaintiff cannot "exhaust a remedy that does not exist." *Stewart v. Evans,* 275 F.3d 1126, 1130 (D.C Cir. 2002) (denying defendants' claim that plaintiff must exhaust remedies under the Civil Service Reform Act before bringing a *Bivens* action, where the statute does not relate to the alleged conduct). Contrary to

defendants' argument (*see* Defs.' Opp at 13), plaintiff is not seeking additional information or any other available remedy. Rather, plaintiff is attempting to impose an affirmative duty on the agencies to provide a notice that heretofore they have refused to do.

Accordingly, defendants' arguments do not preclude consideration of the merits of plaintiff's claim, and their motion to dismiss will be denied.

### B.  *Motion for Summary Judgment*

The Court's inquiry involves an interpretation of 5 U.S.C. § 552(a)(6)(B)(i).  This subsection was amended by the Electronic FOIA Amendments of 1996, Pub. L. No. 104-231, which changed the initial response period in subsection (a)(6)(A) from ten to twenty days and added to subsection (a)(6)(B) a process whereby agencies and requesters were required to work together to address unusually burdensome requests that could not be processed within the statutory time period.  The relevant statutory language, including the 1996 amendments (which appear in bold, italicized print), provides:

>  (6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall–
>>  (i) determine within *20* [ten] days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and
>>  (ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.
>  (B)*(i)* In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended

by written notice to the person making such request setting forth the ***unusual circumstances*** [reasons] for such extension and the date on which a determination is expected to be dispatched.  No such notice shall specify a date that would result in an extension for more than ten working days, ***except as provided in clause (ii) of this subparagraph.***

***(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).***

***(iii)*** As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests–

> (I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;
>
> (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or
>
> (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein . . . .

5 U.S.C. § 552(a)(6)(A)-(B)(i)-(iii) (deleted language in brackets).

Plaintiff argues that by adding the new language to (a)(6)(B)(ii) in 1996, Congress made the provision of notice of "unusual circumstances" mandatory in all circumstances when an agency is unable to comply with the initial twenty-day time limit set forth in subsection (a)(6)(A). Defendants respond that an agency can only invoke such an extension under subsection (a)(6)(B) when there are "unusual circumstances," as defined in the FOIA, and second, whether to invoke the extension is within the agency's discretion.  The Court agrees with defendants, for plaintiff's argument finds no support in the statute's language or in its legislative history.

16

The Court first considers the plain language of the FOIA itself.  *See Ardestani v. INS*, 502

U.S 129, 135 (1991).  In so doing, the Court is mindful of a "central tenet" of statutory

interpretation – a statute must be "considered in all its parts when construing any one of them."

*Lexecon v. Milberg Weis Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998).  The Court must not

be "'guided by a single sentence or member of a sentence, but look to the provisions of the whole

law, and its object and policy.'"  *United States Nat'l Bank of Oregon v. Independent Ins. Agents*,

508 U.S 439, 455 (1993) (citation omitted).  "Statutory construction 'is a holistic endeavor' . . .

and, at a minimum, must account for a statute's full text, language as well as punctuation,

structure, and subject matter."  *Id.* (citations omitted).

As both parties agree, agencies must first comply with the FOIA's initial requirement of

responding within twenty days to a request and notifying the requester of the agency's decision.

*See* 5 U.S.C. § 552(a)(6)(A)(i).  However, the question presented here is whether an agency must

notify a requester that it is seeking an extension under 5 U.S.C. § 552(a)(6)(B)(i) in *every* instance

when it does not comply with subsection (a)(6)(A) by responding within twenty days.  The plain

language of the statute makes clear that providing such notice and seeking an extension under

subsection (a)(6)(B)(i) is discretionary, for the statute limits the circumstances when a ten-day

extension is possible to certain delineated circumstances, and as to those circumstances, the

agency "may," but is not required to, invoke an extension.

As noted above, Congress enumerated only three instances that are sufficiently "unusual"

to justify such extensions.  *See* 5 U.S.C. § 552(a)(6)(B)(iii)(I)-(III).  However, under plaintiff's

interpretation, the definition of "unusual circumstances" would be rendered meaningless, for an

agency would be required to seek an extension in all cases where it did not comply within the

17

twenty-day deadline.

The origin of this limited definition of "unusual circumstances" is the 1974 amendments to the FOIA, when Congress allowed for a ten-day extension for any of the three enumerated instances of "unusual circumstances." *See* S. Conf. Rep. No. 93-1200, at 9-10 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6285, 6289; H.R. Conf. Rep. No. 93-1380 (1974), *reprinted in* House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (Pub. L. No. 93-502), Source Book, 94th Cong., 1st Sess., 228 (Joint Comm. Print 1975) (hereinafter "Source Book") (same).[2] When crafting the new language for subsection (a)(6)(B) in 1996, Congress understood the meaning of the 1974

---

[2]The meaning of "unusual circumstances" is set forth clearly in the 1974 legislative history·

> The conference . . . incorporates the 10-working-day extension of the Senate amendment for "unusual circumstances" in situations where the agency must search for and collect the requested records from field facilities separate from the office processing the request, where the agency must search for, collect, and examine a voluminous amount of separate and distinct records demanded in a single request, or where the agency has a need to consult with another agency or agency unit having a substantial interest in the determination because of the subject matter.

*See* S. Conf. Rep. No. 93-1200, at 9-10 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6285, 6289; H.R. Conf. Rep. No. 93-1380 (1974), *reprinted in* Source Book 228 (same). Additionally, on the Senate floor in 1974, Senator Kennedy noted that the FOIA "provides that 10 days may be added to either the reply or appeal time if 'unusual circumstances,' *as narrowly defined in the bill*, are presented." 120 Cong. Rec. S17,017 (1974) (statement of Senator Kennedy), *reprinted in* Source Book 288 (emphasis added); *see also* 120 Cong. Rec. S17,021 (1974) (statement of Senator Hruska), *reprinted in* Source Book 298 ("[The FOIA] imposes reasonable time limits under which an agency must respond to a request but *permits the agency to extend the time for certain compelling reasons*.") (emphasis added).

amendments,[8] and chose not to change the 1974 language that defined "unusual circumstances" and established that time limits "may be extended by written notice" only in such "unusual circumstances." Thus, one cannot look to the 1996 amendments to argue that Congress intended to change the original intent of the 1974 enactment.

Second, as defendants correctly argue, electing to take an extension in "unusual circumstances" under 5 U.S.C. § 552(a)(6)(B)(i) is "entirely a matter of agency discretion, not a mandatory duty of which plaintiff properly can complain here." (Defs.' Mem. at 28.) The statute makes clear that "[i]n unusual circumstances . . . the time limits . . . *may* be extended by written notice." 5 U.S.C. § 552(a)(6)(B)(i).

Congress' choice of language is significant. "[T]he usual presumption is 'that "may" confers discretion, while "shall" imposes an obligation to act.'" *International Union, UAW v. Dole*, 919 F.2d 753, 756 (D.C Cir. 1990) (citation omitted). "Considering the frequency with which it uses the two words, Congress can be expected to distinguish between 'may' and 'shall.'" *Id.* In *Dole*, this Circuit endorsed the principle that "the use of different language in different parts of the same statute creates a strong inference that different meanings are intended." *Id.* (citing *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C. Cir. 1984)) In 5 U.S.C.

---

[8] With respect to "unusual circumstances," Congress stated in 1996·

The FOIA currently permits an agency in "unusual circumstances" to extend for a maximum of ten working days the statutory time limit for responding to a FOIA request, upon written notice to the requestor setting forth the reason for such extension. The FOIA enumerates various reasons for such an extension. These reasons include the need to search for and collect requested records from multiple offices, the volume of records requested, and the need for consultation with other components within the agency.

H R Rep. No. 104-794, at 23 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3466.

§ 552(a)(6)(A)-(B), the juxtaposition of the words "may" and "shall" creates a similarly strong

inference that "may" cannot be equated with "shall" under the FOIA:

> "(6)(A)  Each agency   .  *shall* – (i) determine within 20 days . . .  (B)(i)  In
> unusual circumstances . . . time limits .   . *may* be extended by written notice. . .
> No such notice *shall* specify a date . . .  (ii) With respect to a request for which
> written notice under clause (i) extends the time limits . . . the agency *shall* notify
> the person .  .  ."

*Id.* (emphasis added).

Absent clear evidence to the contrary, it is fair to assume that Congress appreciated the

distinction that it was making when it stated that time limits "may" be extended.  Indeed, if it had

intended to require otherwise, it could easily have done so.  *See Dole*, 919 F.2d at 756 (assuming

that if Congress had meant that a state agency "shall waive" repayment, instead of "may waive"

repayment, it would have stated it without ambiguity) (citing *Hecht Co. v. Bowles*, 321 U.S. 321,

326-27 (1944) (use of "may" and "shall" in same sentence implies purposeful use of each term)).

"[T]he ordinarily discretionary overtones of the word 'may' 'can be defeated by indications

of legislative intent to the contrary or by obvious inferences from the structure and purpose of the

statute.'" *Dole*, 919 F.2d at 756-57 (quoting *United States v. Rodgers*, 461 U.S. 677, 706 (1983))

To that end, plaintiff argues unconvincingly that defendants have ignored the context in which the

"may" appears and that when considering the FOIA's "'other language, its structure, and its

purpose,'" it becomes clear that Congress intended that agencies must provide notice when unable

to meet statutory deadlines.  (Pl.'s Mem. at 29) (quoting *Halverson v. Slater*, 129 F.3d 180, 187-88

(D.C. Cir. 1997).)  Plaintiff is mistaken, however, for there is no indication in the legislative

history or in the statute's structure and purpose that Congress intended "may" to mean "shall."

To reach its conclusion, plaintiff selectively quotes from the statute and its legislative

20

history while ignoring the unequivocal language that undercuts its position.  First, plaintiff fails to

address the clear evidence that Congress intended in 1974 to make extensions under subsection

(a)(6)(B) permissive.  For example, as previously noted, the Conference Report states· "[T]his ten

day extension *may* be invoked. . ."  S. Conf. Rep. No  93-1200, at 9-10 (1974), *reprinted in* 1974

U.S.C.C.A.N  6285, 6289; H.R. Conf. Rep. No  93-1380 (1974), *reprinted in* Source Book at 228

(same) (emphasis added).[9]  The original 1974 language survived without change in 1996.  Second,

plaintiff emphasizes the mandatory language of 5 U.S.C. § 552(a)(6)(B)(ii), but neglects to

mention that such notice is only required after an agency exercises its discretionary authority to

extend the time limits under 5 U.S.C. § 552(a)(6)(B)(i).  Third, plaintiff's reliance on the 1996

legislative history is entirely misplaced (*see* Pl.'s Rep. at 18), since plaintiff fails to cite the

complete paragraph but relies only on the language which appears below in brackets:

> Unusual Circumstances. - The FOIA currently permits an agency in "unusual
> circumstances" to extend for a maximum of ten working days the statutory time
> limit for responding to a FOIA request, upon written notice to the requestor
> setting forth the reason for such extension.  The FOIA enumerates various
> reasons for such an extension.  These reasons include the need to search for and
> collect requested records from multiple offices, the volume of records requested,
> and the need for consultation with other components within the agency.  [An
> extra ten days may still provide an insufficient time for an agency to respond to
> unusually burdensome FOIA requests.  The bill provides a mechanism to deal
> with such requests, which an agency would not be able to process even with an
> extra ten days.  For such requests, the bill requires an agency to inform the
> requestor that the request cannot be processed within the statutory time limits
> and provide an opportunity for the requestor to limit the scope of the request so
> that it may be processed within statutory time limits, and/or arrange with the
> agency a negotiated deadline for processing the request.]

H.R. Rep. No. 104-794, at 23 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3466.  As is obvious,

_____

[9]*See also* 120 Cong. Rec. S36,878, *reprinted in* Source Book 471 (statement of Senator
Bayh) ("[A]n agency can extend the time for up to 10 working days, two weeks."); *see also*
statement of Senator Hruska, *supra*, at n 7

plaintiff omits the introductory language, which indicates the permissive nature of the initial extension.

Finally, plaintiff also misreads a 2002 report of the House Committee on Government Reform, when arguing that the report "interprets the statute as imposing a requirement to notify requesters when the agency is unable to respond within the statutory deadline." (Pl.'s Rep. at 19.) The particular language cited by plaintiff states. "The agency is supposed to notify the requester whenever an extension is invoked." . . . "Agencies that take more than 20 days to respond do not always notify each requester that an extension has been invoked." H.R. Rep No. 107-371, at 13 & n.25 (2002). However, when this language is read in context, it is clear that the Committee did not understand that notice was required, for House Report 371 states.

> The FOIA permits an agency to extend the time limits up to 10 days in unusual circumstances  These circumstances include the need to collect records from remote locations, review large numbers of records, and consult with other agencies. The agency is supposed to notify the requester whenever an extension is invoked.

*Id.* at 13, *available at* 2002 WL 399496. Then, as a footnote to this language, the report adds: "Agencies that take more than 20 days to respond do not always notify each requester that an extension has been invoked " *Id.* at n.25.

Plaintiff's arguments that defendants' interpretation frustrates the underlying purposes of the statute fare no better. For example, plaintiff argues that a permissive interpretation of the notice provision frustrates the purposes of the 1996 amendments, because it would allow an agency to avoid giving a requester the opportunity to modify a request, as provided in subsection (a)(6)(B)(ii), so as to speed up an agency's response. (Pl.'s Mem. at 32-33; Pl 's Rep. at 21.) However, as explained above, subsection (a)(6)(B)(ii) was not written to provide this negotiation

process to every requester where the agency is unable to respond within the statutory time limit. While plaintiff may advocate that such a result is preferable, Congress did not provide that whenever an agency does not respond in twenty days, it has the duty to provide notice so that the requester can modify his or her request. Rather, under 5 U.S.C § 552(a)(6)(B)(ii), the negotiation process is only triggered where there are unusual circumstances, as defined by subsection (a)(6)(B)(iii)(I)-(III), and the agency invokes the ten-day extension provision of subsection (a)(6)(B)(i).

Similarly, plaintiff's argument that defendants' interpretation impermissibly provides agencies with "the power to defer judicial review" is unpersuasive. (Pl.'s Mem. at 33.) Under the statutory scheme in existence at the time that Congress enacted the 1996 amendments, a FOIA requester could sue after the twenty-day time limit had elapsed if the agency provided notice that it would not be able to process the request in time or if the agency failed to respond. *See, e.g.,* *Pollack v. United States Dep't of Justice*, 49 F 3d 115, 118-19 (4th Cir. 1995) ("'[a requester] shall be deemed to have exhausted administrative remedies . . if the agency fails to comply with the applicable time limit provisions.'") (quoting 5 U.S.C. § 552(a)(6)(C)(i)). If, however, the agency invoked the ten-day extension available to it, the date on which the requester could seek judicial review would be delayed by up to ten days. It is fair to assume that Congress understood this structure when it enacted the 1996 amendments, *see Bowen v. Massachusetts*, 487 U.S. 879, 880 (1988) (it is a "well-settled presumption" that "Congress understands the state of existing law when it legislates"), but nonetheless, it chose not to change this framework. Rather, it added subsection (a)(6)(B)(ii) to give the requester additional tools to expedite the process in the event that the ten-day extension is invoked by the agency. Thus, the time for seeking judicial review has

remained the same under the 1996 amendments, but where there are "unusual circumstances" and where the agency chooses to extend the deadline by ten days, the agency must negotiate with the requester in an effort to expedite the process thereafter if the agency is not able to process the request within the extended time period. *See* 5 U.S.C. § 552(a)(6)(B)(ii).

## CONCLUSION

For the aforementioned reasons, defendant DOE must comply, within twenty days of the date of this Order, with plaintiff's August 2001 FOIA request for the names and addresses of the borrowers. As to Count II, the Court finds that there is no mandatory notice requirement under 5 U.S.C. § 552(a)(6)(B)(i). A separate Order accompanies this Memorandum Opinion.

*Ellen S Huvelle*

ELLEN SEGAL HUVELLE
United States District Judge

Date: 6|14|02

24